NOS. 12-04-00013-CR
 12-04-00014-CR
 12-04-00015-CR
 12-04-00016-CR
 
IN THE COURT OF APPEALS
 
TWELFTH COURT OF APPEALS DISTRICT

TYLER, TEXAS
EDWARD BECK SANDEFER,                        §                 APPEAL FROM THE 241ST
APPELLANT
 
V.                                                                         §                 JUDICIAL DISTRICT COURT OF

THE STATE OF TEXAS,
APPELLEE                                                        §                 SMITH COUNTY, TEXAS
                                                                                                                                                            
MEMORANDUM OPINION
            Edward Beck Sandefer appeals his jury convictions for manslaughter and unlawful
possession of a firearm, body armor, and a controlled substance. The trial court sentenced him to
twenty years of imprisonment each for manslaughter and possession of a controlled substance and
ten years of imprisonment each for possession of a firearm and body armor. The judge also assessed
a ten thousand dollar fine in each case and ordered the sentences to run concurrently. In four issues,
Appellant complains of the trial court’s denial of his motions to suppress and for mistrial, alleged
charge error, and insufficient evidence. We affirm.
 
Background
            In the early morning hours of June 8, 2002, Appellant shot Tony Reeves and Kara Parker
while they were inside his home. Reeves died at the scene and Parker died later that day of a head
wound. The jury rejected Appellant’s claim that he shot in self defense and found him guilty of
second degree manslaughter. He was also convicted of possession of items found during searches
conducted due to the shooting. This appeal followed.
 
Motions to Suppress
            In his first issue, Appellant urges numerous arguments contending that the trial court erred
in not granting his four motions to suppress in which he asked that all evidence seized be declared
inadmissible. He includes complaints about the adequacy and veracity of the affidavits and the
legality of the methods used to obtain the information contained in the affidavits. He also complains
about the scope of the warrants and the officers’ failure to comply with all statutory requirements.
Standard of Review
            A trial court’s decision on a motion to suppress is reviewed under an abuse of discretion
standard. Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). An appellate court should
give almost total deference to a trial court’s determination of historical facts supported by the record,
especially when the trial court’s fact findings are based on an evaluation of credibility and demeanor. 
Id. Generally, we consider de novo issues that are purely questions of law. Id. at 87.
            In a suppression hearing, the trial court is the sole trier of fact and judge of the credibility of
the witnesses and the weight to be given their testimony. State v. Ross, 32 S.W.3d 853, 855 (Tex.
Crim. App. 2000). Accordingly, the judge may believe or disbelieve all or any part of a witness’s
testimony, even if that testimony is not controverted. Id. If the trial court’s decision is correct on
any theory of law applicable to the case, the decision will be sustained. Id. at 856.
Affidavits
            Appellant argues that the affidavits in support of the warrants did not establish probable
cause to show Appellant had committed a criminal act, to demonstrate that the items named in the
warrants would constitute evidence of a crime, or to warrant the belief that contraband would be
found in a specified place. He also argues that material misrepresentations of fact and purposeful
omissions of relevant facts in the affidavits make the warrants invalid. He further argues that the
warrants are invalid because the affidavits contain information resulting from an illegal search of the
home and from statements unlawfully obtained from him.
            On June 8, 2002, Detective Wayne Thomas of the Tyler Police Department prepared four
evidentiary search warrants and one arrest warrant, all supported by similarly worded affidavits. 
These warrants were signed by the magistrate at 7:40 a.m. on June 8 authorizing Appellant’s arrest
and searches of Appellant’s home, pickup, and body, and a search of Parker’s vehicle. In the
affidavits, Thomas explained that police dispatchers notified Thomas and advised him he was needed
at a residence located at 1822 Knob Hill because there had been a shooting at that location. At the
scene, Thomas was advised that the owner of the residence, Appellant, had found his front door
standing open and he went in to see what was going on. When Appellant walked into the hallway
area, a man was there holding a hammer over his head. Appellant shot the man with his .45 caliber
Para-Ordinance pistol. He then went to a nearby Whataburger and called the police. Appellant 
advised the police that someone was standing inside his residence and he shot them.
            Thomas also explained in the affidavit that, when he arrived at the residence, Appellant was
sitting in the back seat of a police vehicle. Thomas observed Appellant using his cellular telephone. 
Sergeant Bill Goecking told Thomas that he heard Appellant tell someone on his cellular telephone
that he “had killed two people.” Police found one deceased male, identified as Tony Reeves, inside
the home. There was also a female, identified as Kara Parker, who had been transported to a hospital
for treatment of a gunshot wound to the head.
            Thomas also included in his affidavit a statement made by Christian Eric Duffner at the
scene. Duffner stated that Appellant had called him around 12:00 midnight and told Duffner to go
to Appellant’s house. When Duffner and his girlfriend arrived at Appellant’s house, Duffner noticed
that the garage door was “crashed” on Appellant’s motorcycle and the main door to the house was
open. Duffner stepped into the house, saw a female on the floor who was choking on her own blood,
ran out of the house, and called police. He was told by the person on the phone that Appellant had
called it in as a robbery. Duffner did not see Appellant at the house. Duffner stated that as they were
pulling in, he saw a dark-colored Ford SUV and a car pull out past them.
            The affidavit in support of the June 8 warrant authorizing a search of Appellant’s vehicle
includes the information set out above and a statement by Laura Mundt, who was with Duffner that
night. She stated that she did not remember seeing Appellant’s pickup at the residence when they
first arrived and did not see when the pickup arrived on the scene. 
            Thomas also prepared an affidavit in support of a second arrest warrant, dated June 10, 2002. 
That affidavit includes the same basic facts, omits the statements by Duffner and Mundt, and
explains that Parker died of her gunshot wound. It also references Appellant’s June 9 statement to
police, made during an interview in the presence of his attorney, that he shot Parker.
            On June 18, 2002, Thomas prepared an affidavit for a second search warrant for Parker’s car. 
The copy included in the record does not include the pages containing Thomas’s factual account
showing why he believed he had probable cause for issuance of the warrant. The return and
inventory lists seven items, none of which was offered into evidence at trial.
            On June 21, 2002, Thomas prepared an affidavit for a second warrant for Appellant’s pickup. 
Again, the copy in the record does not include Thomas’s factual account showing why he believed
he had probable cause for issuance of the warrant. The return and inventory, dated the same day, 
states that no items were seized during the search pursuant to this warrant.
            A search warrant must be supported by an affidavit setting forth substantial facts establishing
probable cause for its issuance. Tex. Code Crim. Proc. Ann. art. 18.01(b) (Vernon 2005);
Bradshaw v. State, 40 S.W.3d 655, 660 (Tex. App.–San Antonio 2001, pet. ref’d.). Probable cause
to support the issuance of a search warrant exists when the facts submitted to the magistrate are
sufficient to justify a conclusion that a specific offense has been committed, the specifically
described property or items that are to be searched for or seized constitute evidence of that offense
or evidence that a particular person committed that offense, and the object of the search is located
on the particular person, place, or thing to be searched. Tex. Code Crim. Proc. Ann. art. 18.01(c)
(Vernon 2005); Bradshaw, 40 S.W.3d at 660. We examine the four corners of the affidavit to
determine whether probable cause exists. Bradshaw, 40 S.W.3d at 660. A search warrant affidavit 
must be read in a common sense and realistic manner, and reasonable inferences may be drawn from
the facts and circumstances contained within its four corners. Cassias v. State, 719 S.W.2d 585,
587-88 (Tex. Crim. App. 1986) (op. on reh’g). In determining whether probable cause existed, the
appellate court reviews the totality of the circumstances surrounding the making of the affidavit. 
Illinois v. Gates, 462 U.S. 213, 238-39, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527 (1983). A
magistrate’s determination to issue a warrant is subject to a deferential standard of review. 
Swearingen v. State, 143 S.W.3d 808, 811 (Tex. Crim. App. 2004). 
Probable Cause 
1) To show Appellant committed a crime
            It is an offense to intentionally and knowingly cause the death of an individual by shooting
him with a firearm. See Tex. Pen. Code Ann. § 19.01 (Vernon 2003). As the affidavit indicates,
Appellant told the police dispatcher and officers at the scene that he shot someone inside his home. 
Police located one deceased male and one critically injured female inside the residence. This is
sufficient to show probable cause that Appellant committed a crime. Appellant argues that, because
the affidavit shows he shot an individual inside his home and that individual was holding a hammer
over his head, the shooting was not a crime. Apparently in reliance on the theory of self defense, he
asserts that, under these circumstances, the allegations are insufficient to demonstrate probable cause
to believe that the shooting was a criminal act. We disagree. The question of whether the defendant
has a viable defense does not arise at this stage. See Wright v. State, No. 05-03-01082-CR, 2004
Tex. App. LEXIS 10894, at *7 (Tex. App.–Dallas Dec. 3, 2004, pet. ref’d) (not designated for
publication) (Where defendant was in possession of stolen car, officers had probable cause to believe
he committed an offense even though he could, at trial, assert the affirmative defense that an owner
can remove the Nader sticker from his car.). The affidavit set forth sufficient facts to justify a
conclusion that Appellant committed a homicide. See Tex. Pen. Code Ann. § 19.01.
2) To show the items named would constitute evidence of the crime
            Appellant’s only argument in support of his assertion that the affidavits failed to establish
probable cause sufficient to demonstrate that the items of evidence named in the warrants would
constitute evidence of the crime is his statement that there is no discussion in the affidavits as to how
the items constituted evidence of the crime being investigated. Because we are required to construe
the briefing rules liberally, we shall address the contention. See Tex. R. App. P. 38.9. Thomas stated
in his affidavits that Appellant had shot a man inside Appellant’s residence using a .45 caliber Para-Ordinance pistol. Accordingly, we consider whether the affidavits showed probable cause that the
items named in the warrants would constitute evidence of homicide by the use of a firearm. 
            The June 8 search warrant for Appellant’s residence named the following as evidence to be
seized: “blood, other body fluids, fingerprints, clothing, identification firearms, holsters, reloading
devices, ammunition, spent casings, spent projectiles, documents relating to ownership or occupancy
of the residence, and any and all other evidence that constitutes evidence of an offense or tends to
show that a particular person commited [sic] an offense.” The June 8 search warrant for Appellant’s
pickup authorized seizure of “blood, other body fluids, fingerprints, clothing, identification firearms,
holsters, reloading devices, ammunition, spent casings, spent projectiles, documents relating to
ownership or occupancy of the residence [sic], and any and all other evidence that constitutes
evidence of an offense or tends to show that a particular person commited [sic] an offense.” The
June 8 and June 18 search warrants for Parker’s car and the June 21 search warrant for Appellant’s
pickup authorized seizure of 
 
blood, hair and saliva, firearms and ballistic evidence, blood, other body fluids, fingerprints, clothing,
identification firearms, holsters, reloading devices, ammunition, spent casings, spent projectiles,
documents relating to ownership or occupancy of the vehicle, clothing, shoes, personal items of
Edward Beck Sandefer, and any and all other evidence that constitutes evidence of an offense or tends
to show that a particular person commited [sic] an offense.


            The June 8 search warrant for the body of Edward Beck Sandefer authorized seizure of
“blood, hair and saliva, and the clothing, shoes, personal items of Edward Beck Sandefer, and any
and all other evidence that constitutes evidence of an offense or tends to show that a particular
person commited [sic] an offense.”
            Appellant has not complained of a specific item, but all items requested to be seized. Neither
has he pointed to the places in the record where offensive items were actually placed into evidence. 
With the possible exception of a request for Appellant’s blood, hair, and saliva, which apparently
were never offered into evidence, none of the items mentioned in the affidavits stands out as unlikely
to reveal potential evidence of homicide. While Thomas did not include a discussion in the
affidavits of how the named items constituted evidence of homicide, a warrant is not invalid merely
because the officer failed to state the obvious. See Nichols v. State, 877 S.W.2d 494, 498 (Tex.
App.–Fort Worth 1994, pet. ref’d). When interpreted as a whole and in a common sense and realistic
manner, we conclude the supporting affidavits were sufficient to demonstrate that the named items
to be seized constituted evidence of homicide. See Cassias, 719 S.W.2d at 587-88. The affidavits
are not insufficient in this respect.
 
3) To show the items would be found in the places requested to be searched
            Appellant’s argument under this sub-issue is that “there is no discussion within the affidavit
of the particularly named items requested to be seized.” The affidavits reflect that Appellant was
standing inside his residence when he shot Reeves and Parker. When officers found them in the
home, Reeves was already dead and Parker was in critical condition with a gunshot wound to the
head. To agree with the magistrate’s determination of probable cause, we need only find that the
facts and circumstances described in the affidavit would warrant acceptance by a person of
reasonable caution of the inference that evidence of homicide could be found in Appellant’s
residence and pickup, on his person, and in Parker’s vehicle. See United States v. McKinney, 758
F.2d 1036, 1043 (5th Cir. 1985). A nexus between the place to be searched and the items to be
seized may be established through direct observation or through normal inferences. See United
States v. Robins, 978 F.2d 881, 892 (5th Cir. 1992). The magistrate could have inferred that
evidence of homicide would be found in the residence where it occurred and on the person of the
individual who did the shooting. Likewise, even though the affidavits do not explain why evidence
might have been located in either Appellant’s pickup or Parker’s vehicle, the magistrate could infer
that vehicles at the scene belonging to the shooter and his victims might harbor evidence of
homicide. We conclude that the affidavits were not insufficient to show the items would be found
in the places requested to be searched. 
Misrepresentations and Omissions
            Appellant contends that Thomas misrepresented and/or omitted the following facts from the
affidavits:
            1) the information that the individuals shot by Appellant were in the process of burglarizing
his home at the time he confronted them;
            2) that Reeves threatened/attacked Appellant with a hammer prior to the shooting, which
Appellant did in his own defense;
            3) that Appellant’s house had been burglarized approximately one week before;
            4) that the police had determined a possible point of recent forced entry into Appellant’s
home, with the garage door being knocked from its track and lying on Appellant’s motorcycle, and
with the door leading from the garage and entering into the house having been forced open;
            5) that Appellant had summoned the police to his house by a 911 call after the shooting,
indicating in that call that he had discovered the burglars in his home and been forced to shoot in
defense to the threat/attack made against him; and
            6) that Appellant had called his parents to come to the scene of the shooting.
Appellant argues that all of this information was known to Thomas at the time he executed the
affidavit and it was material as to whether a crime or a justified shooting had been committed by
Appellant. However, he continues, Thomas deliberately omitted the information from the affidavit
and misrepresented the facts known to him. Appellant asserts Thomas misled the magistrate and,
without the inclusion of the misrepresentations, the affidavits lacked probable cause to demonstrate
that any crime had been committed.
            Where a subfacial challenge to the affidavit is made, our duty is to examine the record of the
suppression hearing to determine whether the defendant met his burden. See United States v.
Martin, 615 F.2d 318, 328 (5th Cir. 1980). Claims of material omissions are treated the same as
claims of material misstatements. Brooks v. State, 642 S.W.2d 791, 796-97 (Tex. Crim. App. [Panel
Op.] 1982). If a defendant makes a substantial preliminary showing that the affiant knowingly and
intentionally, or with reckless disregard for the truth, included a false statement in the warrant
affidavit, the defendant must be given a hearing to determine the validity of his claim. Franks v.
Delaware, 438 U.S. 154, 155-56, 98 S. Ct. 2674, 2676, 57 L. Ed. 2d 667 (1978). In cases where the
defendant claims the affidavit contains material omissions, the defendant must prove by a
preponderance of the evidence that omissions were in fact made and that they were made
intentionally or with a reckless disregard for the accuracy of the affidavit. If the defendant carries
this burden, the reviewing court then determines if the affidavit would still establish probable cause
for the search if the omitted material were included in the affidavit. If not, the court will void the
warrant and suppress the evidence seized pursuant to it. Martin, 615 F.2d at 328.
            Although every detail was not spelled out, the magistrate could glean from the affidavits that
Appellant came home and found that, although closed when he left, the garage door was partially
open and the front door to his house was standing open as if intruders were inside. She could infer
from the fact that Reeves was holding a hammer over his head that he was threatening to assault
Appellant. Further, the affidavits include Duffner’s statement that he had been told by the police
dispatcher that Appellant “had called it in as a robbery.” Therefore, information that the individuals
shot by Appellant were possibly in the process of burglarizing his home at the time he confronted
them and that Reeves threatened or attacked Appellant with a hammer prior to the shooting was
included in the affidavits. 
            On the other hand, Sergeant Bill Goecking testified at the hearing explaining that they did
not see classic signs of a burglary. In the absence of concrete evidence of a burglary, we cannot
conclude that Appellant met his burden to prove this information was omitted or that Thomas chose
his words with a reckless disregard for the accuracy of the affidavit. On the contrary, Thomas
carefully drafted a fact-based affidavit. 
            Evidence was presented at the hearing showing that Appellant called 911 and reported
shooting two burglars in his home. Other evidence indicated that Appellant told the officers that he
shot in self defense. Evidence presented at the hearing also revealed that Appellant’s home had been
burglarized several times, most recently just a few days before the shooting. Police determined that
possibly the intruders entered the house through the now-broken garage door and then through the
door leading from the garage into the kitchen. At some point after the shooting, Appellant called his
parents, who arrived on the scene shortly after 2:00 a.m. Thomas testified that he did not know for
sure that Appellant had called 911 until after the warrants were signed. He also testified that, to the
best of his recollection, everything Sergeant Goecking and Officer Malmstrom told him is in the
affidavits. He said that he did speak to Appellant’s mother at the scene, but he did not put anything
she said into the affidavit.
            Finally, even if details not inferred were omitted, we conclude they were not material.
Appellant asserts that this information is material because it shows he shot in self defense. Because
the existence of a defense is immaterial to whether the homicide was committed, information about
a defense need not be included in the affidavits in support of the search warrants. See Wright, 2004
Tex. App. LEXIS 10894, at *7.
Unlawfully obtained information in affidavits
            Appellant argues that, while officers rightfully entered his home to address an emergency
situation, they unlawfully re-entered the home after the emergency was neutralized and searched the
residence without a warrant. He asserts that the warrants are invalid because the affidavits contain
information resulting from this illegal search. He also argues that any statements he made to
Sergeant Goecking while confined in the patrol car should have been suppressed because the
statements were made after he was arrested without probable cause and denied access to his attorneys
and parents. Further, he argues, these statements cannot be used in the affidavits to support a finding
of probable cause. Appellant did not specifically identify the offending sentences in the affidavits.
             Under the Exigent Circumstances Doctrine, immediate warrantless searches are allowed
where there is reasonable cause to believe that, absent an immediate search, serious bodily harm or
death may result. Brimage v. State, 918 S.W.2d 466, 500-01 (Tex. Crim. App. 1996) (op. on reh’g). 
Police officers may make warrantless entries and searches when they reasonably believe that a person
within is in need of immediate aid. Id. at 501. When the police come upon the scene of a homicide,
they may make a prompt warrantless search of the area to see if there are other victims or if a killer
is still on the premises. Id. We use an objective standard of reasonableness in determining whether
a warrantless search is justified under the Emergency Doctrine, taking into account the facts and
circumstances known to the police at the time of the search. Id. The police may seize any evidence
that is in plain view during the course of their legitimate emergency activities if it is immediately
apparent that the item seized constitutes evidence, that is, there is probable cause to associate the
item with criminal activity. Martinez v. State, 17 S.W.3d 677, 685 (Tex. Crim. App. 2000);
Brimage, 918 S.W.2d at 501.
            A defendant may challenge the admission of evidence obtained by governmental intrusion
only if he had a legitimate expectation of privacy in the place invaded. Rakas v. Illinois, 439 U.S.
128, 143, 99 S. Ct. 421, 430, 58 L. Ed. 2d 387 (1978). There is no reasonable expectation of privacy
in the back seat of a police car. Meyer v. State, 78 S.W.3d 505, 508 (Tex. App.–Austin 2002, pet.
ref’d). An oral admission against interest or an oral confession of guilt, which does not stem from
custodial interrogation and is given freely, voluntarily, and without compulsion or persuasion, is
admissible evidence against the accused. Shiflet v. State, 732 S.W.2d 622, 623 (Tex. Crim. App.
1985). 
            Appellant summoned police to his residence. When they arrived, Appellant initiated contact
with the officers. He told the officers he came home to find someone in his home and he shot the
intruder. Officers then went in the house to check on the victims and make sure no one in the house
posed any threat. After determining no one posed a threat, the officers noted evidence on the floor
that might be disturbed by paramedics or the fire department and looked for signs of burglary. One
officer videotaped the scene. That video begins at 2:09 a.m. An officer on the tape points out items
such as casings, bullet holes, shells, and the hammer. EMS personnel are seen attending to Parker
and carrying her out of the house. The video was turned off when the officer left the house at 2:19
a.m. The video resumes at 2:26 a.m. while an officer is telling another about the scene. The tape
is turned off less than a minute later. All law enforcement officers who testified stated that they did
not enter the house again until after the search warrants were signed, which was 7:40 a.m. 
            This record does not support Appellant’s assertion that there was an illegal pre-warrant
search. The affidavits provide a basic chronology of facts as known to Thomas at the time, based
on what others had told him. The affidavits do not provide a description of the crime scene details
the officers were noting while in the house pursuant to the Emergency Doctrine. In the affidavits,
Thomas identified statements attributed to Appellant. Some were statements he also made to the 911
dispatcher and to Officer Malmstrom at the scene. Finally, as Appellant has no reasonable
expectation of privacy in the back of a police car, he cannot complain about the use of statements
he made while talking on the phone in the police car. See Meyer, 78 S.W.3d at 508. We also note
that Appellant told someone on the phone that he was sitting in a police car with the camera on him
and thus could not have believed he was talking in private. The affidavits do not contain unlawfully
obtained information. Therefore, the warrants are not invalid on this basis. 
Scope of Warrant
            Appellant asserts that many of the seized items were outside the scope of the warrants. At
the hearing, he introduced the search warrant returns for five of the warrants and a case property
form compiled by police at the scene naming 131 items seized from his residence. He explains that
his counsel highlighted the items on that form which were not named or described in the warrant and
placed it in evidence as Defendant’s pre-trial Exhibit 15. In his brief, he says that “[a]mong such
items were things such as glass fragments, knives, magazines, and videotapes, as well as a plethora
of other items of unnamed evidence.” He argues that there was no testimony indicating that it was
immediately apparent to the officers that the items were instrumentalities of the crime or contraband. 
Further, he asserts, there was no testimony that there was, at the time of the seizure, a nexus between
the items seized and the offense being investigated.
            An officer may seize mere evidence of a crime even though such property is not particularly
described in the search warrant when the objects discovered and seized are reasonably related to the
offense in question, when the officer at the time of the seizure has a reasonable basis for drawing a
connection between the observed objects and the crime that furnished the basis for the search
warrant, and the discovery of such property is made in the course of a good faith search conducted
within the perimeters of the search warrant. Bower v. State, 769 S.W.2d 887, 906 (Tex. Crim. App.
1989). For the plain view exception to the warrant requirement to attach, two requirements must be
met: 1) the officer must be in a proper position to view the item or lawfully be on the premises and
2) the fact that the officer has discovered evidence must be immediately apparent. Joseph v. State,
807 S.W.2d 303, 308 (Tex. Crim. App. 1991). However, the “immediately apparent” prong does
not require actual knowledge of incriminating evidence. Id.
            According to the warrant returns and the case property list left at Appellant’s residence, a
total of 162 items were seized from the home, the two vehicles, and Appellant’s person. While
Appellant’s counsel highlighted items on the property form that he contended were not included in
the warrant, those highlights are not visible on the copy of the form in our record. Appellant
referenced four categories of those items in general, glass fragments, knives, magazines, and
videotapes, as well as “a plethora of other items of unnamed evidence.” 
            Sergeant Connie Castle testified that she helped search the house, and the officers involved
made a list of items seized, Defendant’s pre-trial Exhibit 15. She said they collected items they
thought would have probative value. A bone-handled knife, with blood on it, was placed into
evidence at trial. It was found in plain view, on the bed in the room where Reeves’s body was found. 
Glass fragments were found scattered throughout the house. Some of them were placed into
evidence at trial. The only magazines offered into evidence were the loaded .45 caliber variety. The
victims were shot with Appellant’s .45 caliber gun. There was a reasonable basis for the officers to
draw a connection between these items and the homicide they were investigating. See Morgan v.
State, 816 S.W.2d 98, 104-05 (Tex. App.–Waco 1991, pet. ref’d). No videotapes taken during the
searches were offered into evidence. To the extent Appellant complains of other items not named
in the warrant but actually placed into evidence, we are unable to address the issue further in the
absence of specificity. We conclude that the investigating officers did not exceed the scope of the
warrant.
Warrant Return
            Appellant asserts the failure of the officers to provide an inventory of property seized from
the residence or deliver the return on the warrant to the magistrate renders the search warrant invalid.
Before an officer can take property from a place ordered to be searched, he must prepare a written
inventory of the property taken and present a copy of the inventory to the owner or other person in
possession of the property or leave a copy of the warrant and inventory at the place. Tex. Code
Crim. Proc. Ann. art. 18.06(b) (Vernon 2005). When the officer returns the search warrant, he must
deliver to the magistrate a copy of the inventory of the property taken into his possession under the
warrant. Tex. Code Crim. Proc. Ann. art. 18.10 (Vernon 2005). Although these requirements
appear to be mandatory, ministerial violations of the search warrant statutes do not vitiate the search
warrant in the absence of a showing of prejudice. Pecina v. State, 516 S.W.2d 401, 404 (Tex. Crim.
App. 1974). Officers filled out a case property form, which listed all items seized from Appellant’s
home, and left a copy of it at the residence after the search. Appellant offered the list into evidence
at the hearing. Officer Castle described it as the next best evidence in the absence of the return. 
Appellant has not shown he was prejudiced by the absence of the return.
Inadmissibility of Evidence
            In his final argument under his first issue, Appellant contends that, due to the illegality of his
arrest and detention, the violations of his right to counsel, the deficiencies of the arrest warrant
affidavit, and the illegality of the searches of his residence and vehicle, the evidence seized and the
statements he made should not have been admitted at trial. As explained above, the affidavits were
sufficient to support the warrants and the searches were legal. The affidavits did not contain
information gained from an illegal search or from statements unlawfully obtained from Appellant. 
Appellant has not shown that any items were outside the scope of the warrants, and the failure of the
officers to provide an inventory of the property seized from his residence does not render the search
invalid. Therefore, the trial court did not abuse its discretion in denying Appellant’s motions to
suppress. See Guzman, 955 S.W.2d at 89. We overrule Appellant’s first issue.
 
Factual Sufficiency of the Evidence
            In his second issue, Appellant contends the jury’s determination that he is guilty of
manslaughter is so against the great weight of the evidence as to be clearly wrong and manifestly
unjust. He asserts that the material facts regarding his claim of self defense were uncontested and
the case should be reversed and remanded for a new trial.
Standard of Review
            The sole question considered by the appellate court in a factual sufficiency review is whether,
considering all the evidence in a neutral light, the jury was rationally justified in finding guilt beyond
a reasonable doubt. Zuniga v. State, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004). The court of
criminal appeals has explained that there are two ways in which the evidence may be factually
insufficient. First, when considered by itself, evidence supporting the verdict may be too weak to
support the finding of guilt beyond a reasonable doubt. Id. Second, there may be both evidence
supporting the verdict and evidence contrary to the verdict. In the second scenario, weighing all the
evidence under this balancing scale, the contrary evidence may be strong enough that the beyond-a-reasonable-doubt standard could not have been met, so the guilty verdict should not stand. Id. at
484-85. This standard acknowledges that evidence of guilt can preponderate in favor of conviction
but still be insufficient to prove the elements of the crime beyond a reasonable doubt. Stated another
way, evidence supporting guilt can outweigh the contrary proof and still be factually insufficient
under a beyond-a-reasonable-doubt standard. Id. at 485. However, because the jury is the sole judge
of the facts, we must give deference to jury findings. Cain v. State, 958 S.W.2d 404, 407 (Tex.
Crim. App. 1997). What weight to give contradictory testimonial evidence is within the sole
province of the jury because it turns on an evaluation of credibility and demeanor. Id. at 408-09. 
We may not substitute our judgment for that of the factfinder. Zuniga, 144 S.W.3d at 482. The jury
may choose to believe some testimony and disbelieve other testimony. Margraves v. State, 34
S.W.3d 912, 919 (Tex. Crim. App. 2000).
            When a defendant challenges the factual sufficiency of the rejection of a defense, the
reviewing court employs the same standard of review articulated in Zuniga because once the
defendant has met his or her burden of production of evidence as to a defense, the State bears the
burden to prove Appellant’s guilt of the charged offense beyond a reasonable doubt. See Zuniga,
at 483; Zuliani v. State, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); Dotson v. State, 146 S.W.3d
285, 292 (Tex. App.–Fort Worth 2004, pet. ref’d). A guilty finding is an implicit rejection of the
defense. Zuliani, 97 S.W.3d at 594.
Applicable Law
            Under Texas law, a person commits the offense of manslaughter if he recklessly causes the
death of an individual. Tex. Pen. Code Ann. § 19.04(a) (Vernon 2003). A person acts recklessly,
or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct
when he is aware of but consciously disregards a substantial and unjustifiable risk that the
circumstances exist or the result will occur. Tex. Pen. Code Ann. § 6.03(c) (Vernon 2003). 
Culpable mental state is generally proven through circumstantial evidence. See Dillon v. State, 574
S.W.2d 92, 94 (Tex. Crim. App. [Panel Op.] 1978).
            Self defense serves as a justification excluding criminal responsibility for otherwise criminal
behavior. Tex. Pen. Code Ann. § 9.31 (Vernon 2003). A person is justified in using deadly force
against another when and to the degree he reasonably believes the force is immediately necessary
to protect himself against the other’s use or attempted use of unlawful force, if a reasonable person
in the actor’s situation would not have retreated, and when and to the degree that he reasonably
believes the deadly force is immediately necessary to protect himself against the other’s use or
attempted use of unlawful deadly force, or to prevent the other’s imminent commission of aggravated
kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery. Tex.
Pen. Code Ann. § 9.32(a) (Vernon 2003). However, there is no requirement to retreat when the
person against which force is used is at the time committing an offense of unlawful entry in the
habitation of the actor. Id. § 9.32(b). One cannot recklessly act in self defense. See Mock v. State,
848 S.W.2d 215, 219 (Tex. App.–El Paso 1992, pet. ref’d).
The Testimony
            Appellant’s home had been burglarized several times, most recently only about four days
before the shooting at issue. One witness, Ricardo De LaGarza, testified that Appellant told him that
about $5,000.00 worth of “stuff” had been stolen from him and Appellant wanted De LaGarza to go
with him to get it. Appellant and De LaGarza injected methamphetamine earlier in the evening of
the shooting. Edward Caffrey, a friend of Appellant, testified that Appellant told him that items,
money, and drugs, valued at between $5,000.00 and $8,000.00, had been stolen from his house the
Monday before the shooting. Caffrey stated that, although Appellant had an idea of who stole the
items, Appellant never told him who he thought it was. Caffrey also explained that Reeves wanted
revenge on Appellant for allegedly raping Parker. Caffrey said Reeves had made threats and wanted
to hurt Appellant “pretty bad.” A few days after the shooting, Caffrey told Detective Wayne Thomas
that Reeves and some friends had gone to Appellant’s house on April 7, 2002 “to fuck him up.”
            Christian Eric Duffner, a friend of Appellant who was there the night of the shooting,
testified that Appellant had told him, two or three months before the shooting, that Reeves had
robbed him or broken into his house. Duffner warned Appellant that Reeves knew martial arts, and
Appellant told him he would deal with it and take care of the matter if he had to. Terra Thurman
testified that, about a week before the shooting, Appellant said he knew Reeves and Parker had
broken in and taken valuables and drugs from his house and he would take care of them. She said
he was holding a gun when he made the statement. Marlena Nipp testified that she saw Appellant
two or three days before the shooting and he was carrying a gun. He said that someone had stolen
$6,000.00 and some drugs and that he would kill the people who broke into his house if he found
out who it was.
            On the night of June 7, 2002, after leaving De LaGarza’s house, Appellant went to C.R.
Epperson’s house. He was there only a short time. Appellant needed to deliver some drugs to his
ex-wife and arranged for Epperson to meet him at Appellant’s house after that errand. Appellant
gave Epperson his .45 caliber handgun and his house key because Epperson would get to Appellant’s
house before he would. Appellant had also invited Duffner and Duffner’s girlfriend, Laura Mundt,
to come over. 
            Duffner and Mundt reached Appellant’s house before Epperson. They noticed the garage
door was partially open and resting on Appellant’s motorcycle. Duffner heard a commotion and a
loud scuffling noise inside the house after he knocked. He and Mundt drove to a pay phone and
Duffner called Appellant on his cell phone. Duffner told him someone was in his house and the
phone went dead.



            When Epperson arrived at Appellant’s house, he unlocked the front door and went in, holding
the loaded gun. He saw Reeves, whom he knew, and asked what he was doing there. Epperson did
not see a weapon on Reeves, who asked Epperson not to point the gun at him. A minute or two later,
Appellant arrived and took the gun from Epperson. Appellant told Reeves to get on the floor and
asked Epperson and Duffner, who by then had also arrived, to help him get Reeves on the floor. 
Epperson described Appellant as “mad.” Duffner tried to get Reeves to get on the floor and
encouraged Appellant to remain calm. Epperson testified that Reeves acted nonchalant but in a
stance, ready. Reeves moved backward into the hallway and Appellant followed. Epperson heard
a door shut and two shots. He turned around and quickly left the scene. He never saw Reeves or
Duffner with a weapon and never knew Parker was in the house. 
            Duffner testified that when he arrived, Epperson blocked the front door and told him not to
go in.


 He went in and saw Appellant standing with the gun drawn, telling Reeves to get on the
ground. Duffner said Reeves responded by telling Appellant to shoot him. Duffner described
Appellant as angry but in control of what he was doing. Reeves had nothing in his hands and his
arms were down at his sides. Duffner described Reeves as frightened and crazy. Duffner put his
hand on Reeves’s shoulder and tried to get him to get on the ground to wait for the police. Reeves
acted as though he thought Duffner was going to hit him. Reeves “jumped” back into Appellant’s
bedroom and slammed the door shut. 
            According to Duffner, Appellant advanced, lowered the gun to the door knob, and fired
twice. The door opened while Appellant was still in the hall. Duffner saw Reeves standing there,
and Parker was behind him. Reeves was bleeding and holding a hammer at a ninety degree angle,
chest high. Parker was panicked, crying, screaming, and pleading. Appellant told Reeves to drop
the hammer. Reeves and Parker slowly advanced toward the door. According to Duffner, Reeves
did not drop the hammer. Duffner, who was three or four feet behind Appellant, testified that it did
not appear that Reeves wanted to attack, but simply wanted to get out of the room. Duffner never
saw Reeves make an aggressive attack or act aggressively at all. He never saw Parker touch a
weapon and said she did not appear to be a threat. 
            The gun jammed just seconds after the first two shots. Duffner explained that, as he was
leaving, he turned around just when he got to the front door and saw Appellant backing out of his
bedroom, trying to unjam the gun. As he was walking outside and racing for the car, Duffner heard
ten more gunshots, “pretty fast.” 
            Dr. David Dolinak performed the autopsies on Reeves and Parker. Reeves, who had alcohol,
Valium, and the drug Ecstacy in his system, had been shot five times. He described the wounds, in
no particular order: 1) front chest through the right lung and out the back, 2) left forearm, shattered
the bone, bullet traveled from front to back, 3) right forearm, bullet entered back of arm, traveled up,
broke both bones in forearm and did not exit, 4) bullet entered right side of chest and exited right
upper front chest, direction back to front, upwards and right to left, and 5) bullet entered upper left
thigh in back and exited front side of upper left thigh, slightly upward.
            Parker, who had Valium, Ecstacy, and morphine in her system, was shot once, above her left
eye. Dr. Dolinak explained that it was a close range shot that caused her to go down immediately.
            Detective Noel Martin, with the Smith County Sheriff’s office, analyzed the blood evidence. 
Although he could not determine the exact sequence of all five shots, he identified three separate
locations within the house where blood evidence indicated Reeves was when three of the bullets hit
him: 1) inside the living room close to a chair near the doorway leading to the hall, 2) in the hall,
and 3) in the master bedroom. The height of the area where the blood exited its source, the point of
impact by the bullet, was sixty-eight inches from the floor for the shot in the living room, five and
a half to seven inches in the hall, and thirteen to fourteen inches in the bedroom. Detective Martin
testified that there had been a lot of activity in the area by the chair in the living room and the trail
of blood in the hall moved toward the bedroom. He only saw one bullet hole in or near the bedroom
door and it was twelve to sixteen inches above the doorknob. A bullet was recovered from the wood
floor underneath Reeves’s body. Detective Martin explained that, based on the evidence that the
bullet hit the floor at a ninety degree angle, Reeves was lying on the floor when the bullet was fired
into his body. The detective also explained that there was not much blood on the hammer and, based
on the amount of blood on Reeves’s hands and how much blood he lost, he expected to see more
blood on the hammer. Also, the hammer was lying on top of blood indicating that it ended up where
it did after blood loss had occurred. 
            Tom Bevel, a professor of forensics and expert in blood stain pattern analysis and crime
scene analysis and reconstruction, also interpreted the blood evidence. He explained Reeves’s
movements, based on the trail of blood. He said the beginning of the blood trail is in the master
bedroom, close to the wall just inside the door leading into the bedroom. The trail basically circles
the interior of the bedroom and returns to the door. It goes from the master bedroom out into the hall
and into the living room, then back into the hall where Reeves’s body was found. Reeves was in the
bedroom when he was hit with the shot that started the blood flow. One gunshot went through the
closed bedroom door, some inches above the doorknob. Either that shot started the blood flow or
there could have been a shot through the open door. The first wound could have been the shot to the
right chest but, the shot to the right forearm, which entered from the back, is the best explanation for
the blood flow around the bedroom. There was also damage to the bedroom door and door frame
consistent with forced entry. There were blood-stained wood chips on the floor in the bedroom.
            Bevel testified that the next area in which Reeves was shot was just inside the living room
from the hallway and he was shot while standing. Based on the height of the blood source and the
fact that Reeves was five feet, six inches tall, Bevel explained that this was probably when Reeves
was hit in the left forearm. He said that the shot that entered at the right side of the chest and exited
out the right upper front chest was either the last shot or the next to the last shot. The shot that
entered the left back thigh and exited the front side of the left thigh is consistent with Reeves having
been lying in the hall. A blood spatter seven inches from the floor in the hallway is consistent with
this wound. At least one shot was fired from farther back, while Reeves was on the hall floor,
pushing himself in the direction of the bedroom. He was lying in the doorway to the bedroom, torso
in the bedroom and legs in the hall, when he died. 
            Bevel was unable to determine where in the sequence of events Reeves received the shot to
the front chest. He explained that because that shot was basically level, Reeves would have been
facing the shooter and upright. Bevel testified that there was no significant blood on the hammer
and no evidence the hammer was in Reeves’s hand after the blood got on his hands. He said the
blood was on the floor and then the hammer was placed on top of it.
            Bob Henderson, a forensic consultant, also testified as to his interpretation of the events. In
his opinion, the first shot to Reeves could have been in the living room, after which he moved to the
bedroom. He moved around in the bedroom, bleeding, and then went back into the hall. Blood
stains show the direction of travel from the bedroom to the living room. He noted a swipe pattern
on the floor caused by Reeves’s leg shoving him away from the bedroom. However, the trail is
unclear. Reeves either went back to the living room where he received another shot or he went
straight back and retreated towards the bedroom where he went down. He was shot at least once in
the hallway and then again right at the bedroom door with the door open. Henderson explained that
the damage to the bedroom door jamb is “what you would expect to find if the door was locked and
someone forcefully opened it by kicking or pushing on it real hard.” The bullet hole goes straight
through the door so the door had to have been closed. But there was no blood on the back of the
door. There is a strong likelihood that if he had been shot through the door, there would be blood
on the back side of the door.
            With regard to the hammer, Henderson explained that, knowing Reeves had been shot in both
arms, the chest, and abdomen, he would have expected to see bloody palm prints or a considerable
amount of blood on the handle or flow patterns on the hammer. Reeves’s arms were very bloody. 
The handle area of the hammer is clean. There are three or four impact stains on the hammer. 
Therefore, it was somewhere close to the vicinity when force was applied to the blood source. But
the stains are not consistent with the hammer being held out to the side or in front. In his opinion,
the hammer was placed in the location it was found in after the bloodshed was over. The hammer
was somewhere in the vicinity of the bedroom but it could have been anywhere blood was dripping
or falling. Further, the stains on the hammer indicate it was not in someone’s hand when the blood
hit it.
            Henderson also testified that Appellant could not have been standing as close to Parker at the
time he shot her as he said he was or there would have been a considerable amount of blood on his
shirt. There was stippling on her skin, indicating a close-range shot, but he must have been standing
with his arm more extended to avoid having blood on his shirt.
            On the other hand, there is some evidence supporting Appellant’s self defense theory. 
Reeves and Parker were inside Appellant’s house without permission. Items identified by Appellant
as belonging to him were found in Reeves’s pockets and Parker’s car. Reeves had threatened
Appellant in the recent past. Duffner testified that Reeves held a hammer in the bedroom and never
dropped it while Duffner was observing. Appellant called 911 to report that he had shot intruders
in his home. Both Reeves and Parker had illegal substances in their system. A forensic toxicologist
testified that the substances in Reeves’s bloodstream would make him “zoned out” until adrenaline
was introduced. Then he would become aggressive.
            Appellant’s house had been burglarized several times, most recently just a few days before
the shooting. Appellant testified that several people warned him about Reeves. He said he had
someone in mind who might possibly be responsible for the burglaries, but it was not Reeves or
Parker. He denied telling Caffrey that he knew who robbed him. He said he had some ideas. He
also denied telling Thurman that he knew Reeves was burglarizing his house and denied saying he
would kill anyone. He admitted having separate issues with Reeves. Those issues centered around
the night Parker spent at Appellant’s house. Appellant said he had the gun with him on the night of
the shooting because he was scared of Reeves. Appellant knew that Reeves had pulled knives on
people, beaten people up, and hurt a lot of people. He had heard that Reeves was after him and
wanted to hurt Appellant. He admitted being angry when he found Reeves in his house.
            Appellant described the events leading up to the shooting. He said Epperson was pointing
the gun at a person standing in the doorway leading from the living room to the hall. He took the
gun from Epperson, stepped a few feet closer, and told the person to get on the floor. The man took
a step forward. Appellant told the man a number of times to get on the floor and that he was going
to call the police. Reeves said something about felony probation and not wanting to go back to jail. 
Appellant described Reeves as acting strange and “not all there.” Instead of getting on the floor,
Reeves got closer to Appellant, making him nervous, and inviting Appellant to shoot him. Duffner
tried to get Reeves on the floor, but Reeves resisted and “shot off” toward Appellant’s bedroom. 
Appellant thought he had seen something in Reeves’s hand or at his pocket. He thought Reeves
might have nunchucks in his pocket or in his hand. Appellant explained that he was afraid of what
might happen if there was a fight. He chased Reeves to get him on the floor, so Appellant would not
get hurt and so nothing else would happen. Reeves ran into the bedroom and Appellant saw Parker
hand the hammer to Reeves. This made Appellant even more scared.
            He ran up to the bedroom and looked inside. Reeves and Parker were eight feet from the
doorway and Reeves started walking toward Appellant with the hammer held out in front of him. 
Appellant told him to put the hammer down but Reeves kept coming at him. Appellant had no doubt
that Reeves was going to hit him with the hammer. He was absolutely concerned for his life. 
Appellant was just inside the threshold of the door when Reeves grabbed the door and shut it, hitting
Appellant with the door in the process. The slam of the door pushed Appellant back into the hall. 
Reeves still had the hammer at that time. Appellant was scared and shot the gun toward the door,
twice he believes. The door was not completely closed. He said Reeves was trying to push it shut,
but then he said Reeves was opening it. Reeves was mostly obscured from Appellant’s view. At
that point, the gun jammed and Appellant was really scared.
            Appellant ran back into the living room, attempting to unjam the gun. He stood there for a
couple of seconds and heard movement or running from the bedroom area. As soon as the bullet got
into the gun, someone ran around the corner and ran right up next to Appellant. He said she did not
bump into him but he could feel it or sense it, or maybe it was the wind or the noise or the presence. 
He just pulled the trigger because he was scared. He did not see the person until after he shot her. 
He could hear Reeves in the hall and was still concerned. Appellant stepped over to the hall and saw
Reeves, who was about halfway down to the ground, getting up. He was kind of on his side, trying
to get up. Appellant shot again, without aiming. Appellant testified that he did not see Reeves go
into the living room after the shooting began. He looked around to see if anyone else was there and
stepped past Reeves into the bedroom. He was still scared and said he could not remember
everything. He could not find his cell phone so he ran to a nearby pay phone and called 911,
reporting that he had just shot two people who were burglarizing his house. He then ran back to his
house and spoke to the responding officers. Appellant testified that he did not feel like he had any
options. He did not know what else he could have done. He absolutely felt like the force he used
against Reeves was immediately necessary to prevent Reeves’s unlawful use of deadly force against
Appellant. 
Analysis
            Appellant admits shooting and killing Reeves and Parker, but maintains that the killings were
justified. By its verdict, the jury determined that Appellant consciously disregarded a substantial and
unjustifiable risk that he would kill Reeves and Parker and, concomitantly, found that Appellant was
not justified in using deadly force against them. Our focus, therefore, is on the culpable mental state
evidence.
            The record shows that Appellant’s house had been burglarized several times, most recently
just a few days before the shooting. Appellant had vowed to find out who the burglars were and take
care of the matter himself, that is, without the help of law enforcement. Although Appellant denied
it at trial, two witnesses testified that Appellant believed Reeves was the burglar. Appellant also
denied threatening to kill anyone. Also during the same time period, Reeves threatened Appellant
and wanted revenge for the alleged rape of Parker. Appellant knew of those threats and lived in fear
of Reeves. The night of the shooting, at the time he entered his house, Appellant had a strong
indication that intruders were inside. He had equipped Epperson with a handgun before sending him
to his house, knowing Epperson would arrive before he did. 
            Appellant held a loaded gun when he confronted Reeves, who, at least initially, did not have
a weapon. Duffner described Appellant as angry but in control of what he was doing, very
controlled. He also said it did not appear that Reeves wanted to attack, just to get out of the room. 
Epperson said Appellant was mad when he was holding the gun on Reeves. When Reeves did not
comply with Appellant’s demand to get on the ground, Appellant followed Reeves through a
doorway and down a hall to a bedroom. The forensics evidence indicates that the bedroom door was
forced open and Reeves was shot at three different locations within the house. The evidence shows
that Appellant followed Reeves to that bedroom twice. Reeves was hit with five bullets, only two
of which entered from the front.


 At least one of the five bullets hit him while he was lying on the
floor. The experts’ interpretation of the blood evidence on and around the hammer is at odds with
the theory that the hammer was a real threat. Further, Appellant never explained the damage to the
bedroom door that Bevel and Henderson said was from forced entry. There was a discrepancy
between Henderson’s testimony that the door was closed and Appellant’s testimony that the door
was open. It was within the jury’s province to determine what weight to give all contradictory
evidence. Margraves, 34 S.W.3d at 919; Cain, 958 S.W.2d at 408-09. 
            The specific intent to kill may be inferred from the use of a deadly weapon, unless in the
manner of its use it is reasonably apparent that death or serious bodily injury could not result. 
Medina v. State, 7 S.W.3d 633, 637 (Tex. Crim. App. 1999). With the evidence as recounted above
before it, the jury could reasonably believe Appellant’s conduct was knowing or intentional. See id. 
Intentional and knowing mental states are higher in degree than recklessness. Tex. Pen. Code Ann.
§ 6.02(d) (Vernon 2003). Proof of a higher degree of culpability constitutes proof of the lower
degree of culpability. Tex. Pen. Code Ann. § 6.02(e) (Vernon 2003). Therefore, viewing all the
evidence in a neutral light, we conclude that the evidence supporting the verdict is not too weak to
support the finding of guilt beyond a reasonable doubt and that the contrary evidence is not so strong
that guilt cannot be proven beyond a reasonable doubt. We hold that the evidence is factually
sufficient to support Appellant’s conviction for manslaughter and the jury’s implicit rejection of his
defensive theory. We overrule Appellant’s second issue. 
 
Jury Charge
            In his third issue, Appellant asserts the jury charge contained material misstatements of law
and fact. However, Appellant did not identify specific “material misstatements.” He restated the
objections he made to the charge at trial but did not argue about the content of those objections. He
did not identify the applicable law or explain why the court’s denial of his requests was erroneous. 
He then argues that the jury charge error in this case is harmful because there was insufficient
evidence to convict him without the illegally seized evidence. We presume he refers to the evidence
he complained of in his first issue as having been inadmissible, although he did not specify. Without
further elaboration, Appellant asserts that the issue is whether the erroneous admission of evidence
prejudiced the jury’s consideration of the other evidence or substantially affected their deliberation. 
            We have reviewed the case Appellant relies on to support his argument, Bagheri v. State, 87
S.W.3d 657 (Tex. App.–San Antonio 2002), aff’d, 119 S.W.3d 755 (Tex. Crim. App. 2003). There,
the court determined that admission of inadmissible evidence was harmful in light of several factors,
including the manner in which the jury charge was worded. Id. at 661. Bagheri does not aid
Appellant. Even assuming the charge contained material misstatements of law and fact and that the
trial court erroneously overruled Appellant’s objections to the charge, and assuming further that
some specific yet unidentified connection existed between those statements and certain evidence,
in light of the fact that the evidence was admissible, as explained above, we discern no harm. We
overrule Appellant’s third issue.
 
Jury Argument
            In his fourth issue, Appellant contends the trial court abused its discretion by denying his
motion for mistrial asserted during the State’s jury argument. Appellant argues that the court’s
curative action was cursory and not sufficient to remove the prejudice caused by the State’s attempt
to strike at Appellant over counsel’s shoulder.
            In his argument to the jury at the guilt/innocence phase, defense counsel commented on the
issue of causation. He referred to the charge’s explanation of causation but misstated the law. He
told the jury that “a person is responsible for the result of his conduct only if it would have occurred
but for his conduct and not for some other cause that would have been sufficient in and of itself to
cause the result.” He then reviewed the evidence regarding the cause of Kara Parker’s death. He
told the jury that it must make a determination whether Appellant’s conduct, shooting her, caused
her death or if removing her from life support was sufficient to cause her death. In sum, he said that
if the jury found that removal from life support alone could have been sufficient to cause her death,
Appellant did not commit murder.
            In rebuttal, the prosecutor read the applicable section from the charge, which states, “Under
our law, a person is criminally responsible if the result would not have occurred but for his conduct,
operating either alone or concurrently with another cause, unless the concurrent cause was clearly
sufficient to produce the result and the conduct of the actor clearly insufficient.” He then stated, “As
if that family had something to do with the death of Kara Parker. You know, really, stop and think
about that. The extent that the Defense will go to get this case off track --” 
            Defense counsel’s objection, “striking the defendant over the shoulder,” was sustained, and
the trial court instructed the jury to disregard. His motion for mistrial was denied. The prosecutor
then continued, “He said, ‘Well, unless you find and believe that the family didn’t participate in the
death’ – the defendant put that gun up to Kara Parker’s head, he pulled the trigger, and he killed her. 
Not that moment, not that incident, but he killed her. And the doctors told you, she was going to die. 
I can’t – you heard that evidence. You make that decision.”
            Dr. David Villarreal, the trauma surgeon who treated Parker at the hospital, testified that
medical personnel maintained her basic functions as best they could while they assessed her
condition. After doing a CAT scan, they realized it was a lethal injury. He explained that Parker
could not have breathed on her own without the ventilator. He said there was nothing he could have
done to save her life. She was never responsive. She was in a coma and had no chance of recovery. 
Without medical attention, she would have died even sooner. Dr. David Dolinak, who performed
the autopsy, also stated that Parker died of a gunshot wound.
Applicable Law
            The four permissible areas of jury argument are (1) summation of the evidence; (2)
reasonable deductions from the evidence; (3) answers to the argument of opposing counsel; and (4)
pleas for law enforcement. Wilson v. State, 7 S.W.3d 136, 147 (Tex. Crim. App. 1999). Arguments
attacking defense counsel are improper because they unfairly inflame the jury against the accused. 
Id. Where arguments that strike over the shoulders of defense counsel are not particularly egregious,
an instruction to disregard will generally cure the error. Id. at 148. The denial of a mistrial is
reviewed for abuse of discretion. Simpson v. State, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003). 
Mistrial is appropriate for only highly prejudicial and incurable errors. Id. It may be used to end
trial proceedings when faced with error so prejudicial that expenditure of further time and expense
would be wasteful and futile. Id.
Discussion
            The prosecutor’s reference to the possibility that defense counsel was deliberately trying to
get the case “off track” was an isolated one. The comment can be characterized as “mildly
inappropriate.” See Mosley v. State, 983 S.W.2d 249, 260 (Tex. Crim. App. 1998) (op. on reh’g)
(Prosecutor’s argument that defense counsel was trying to get the jury “off the main road” held
harmless.). After the instruction to disregard, the prosecutor clarified the evidence the jury would
need to look to in order to determine whether Appellant caused Parker’s death, and he did so without
striking at Appellant over the shoulder of his counsel. The prosecutor did not accuse the defense
attorney of lying. In context, the prosecutor’s comment may indicate his belief that the defense
counsel had not clearly explained the law of causation to the jury. With the correct definition of
causation in the charge before it, the jury was able to apply the facts about how Parker died to
determine if the State met its burden and could evaluate the truthfulness of the prosecutor’s assertion
that the defense was attempting to get the case “off track.” See id. Dr. Villarreal testified that
Parker’s wound, admittedly inflicted by Appellant, was life threatening, clearly sufficient to kill her. 
There was no evidence that any of the actions taken in attempting to save her life were clearly
sufficient to kill her. Therefore, considering the evidence, to argue that removing Parker from life
support was the actual cause of her death could be considered an attempt to get the case “off track.” 
See Thompson v. State, 93 S.W.3d 16, 20-21 (Tex. Crim. App. 2001) (Evidence was legally and
factually sufficient to prove cause of death was gunshot wound to the face, not removal from life
support systems.).
            Given the mildness of the comment, the curative instruction, the explanation by the
prosecutor directly linking his argument to that of defense counsel, and the evidence of causation that
was before the jury, the error was not highly prejudicial or incurable. See Simpson, 119 S.W.3d at
272. Accordingly, the trial court did not abuse its discretion in denying Appellant’s motion for
mistrial. We overrule Appellant’s fourth issue.
 
Conclusion
            The trial court did not err in denying Appellant’s motions to suppress or his motion for
mistrial. The evidence is factually sufficient to support the jury’s finding of guilt beyond a
reasonable doubt on the manslaughter charge and to support its rejection of Appellant’s defensive
theory. Any alleged jury-charge error was not harmful. 
            We affirm the trial court’s judgments in all four cases before us. 
 
                                                                                                    SAM GRIFFITH 
                                                                                                               Justice
 
Opinion delivered August 10, 2005.
Panel consisted of Worthen, C.J., Griffith, J., and Bass, Retired J., Twelfth Court of Appeals, Tyler, sitting by assignment.


(DO NOT PUBLISH)